Joseph L. Richardson (SBN 212206)
jlr@mccunelawgroup.com
Brynna D. Popka (SBN 310801)
bdp@mccunelawgroup.com
**MCCUNE LAW GROUP**
31 W. Stuart Ave., Ste. 300
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSAN CHARNEY, individually, <br><br>         Plaintiff, <br> v. <br><br> STATE OF CALIFORNIA; CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; ROBERT ST. ANDRE; and DOES 1 through 50, inclusive, <br><br>         Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES** <br>   1. Failure to Protect from Harm, Violation of the Eighth Amendment (42 U.S.C. § 1983); <br>   2. Wrongful Death (C.C.P. §377.60); <br>   3. Public Entity Liability for Failure to Perform Mandatory Duty; <br>   4. Negligence; <br>   5. Violation of California Government Code §845.6; <br>   6. Negligence (Cal. Civ. Code §1714(a); Cal. Gov. Code §§845.2, 820, 844.6, 845.6 <br><br> **DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff, SUSAN CHARNEY, individually, and for causes of action against the defendants and each of them alleges as follows:

COMPLAINT

## I.   INTRODUCTION

1. Plaintiff Susan Charney brings this civil rights and wrongful-death action arising from the preventable killing of her son, William J. Couste, while he was incarcerated at High Desert State Prison ("HDSP"). Mr. Couste was fatally attacked on April 26, 2025, during a scheduled recreation period on a Level IV yard, after prison officials knowingly allowed a violent environment to persist despite years of documented inmate-on-inmate homicides involving improvised weapons.

2. Defendants were aware—long before Mr. Couste's death—that HDSP suffered from systemic failures in inmate classification, weapon control, staffing, and supervision. These failures created a longstanding and substantial risk that inmates would be assaulted or killed with inmate-manufactured weapons. Despite repeated warnings, investigations, and fatalities, Defendants failed to take reasonable measures to protect incarcerated persons such as William Couste from foreseeable harm.

3. It is a foundational principle of our justice system that punishment follows conviction—not indifference, not brutality, and not death. Even those lawfully convicted and sentenced to prison do not forfeit their humanity. The measure of any society is how it treats its most vulnerable members, including those it incarcerates. Our constitutional commitments require more than confinement; they require dignity, care, and protection from foreseeable harm. When the State takes custody of a human being, it assumes an affirmative obligation to safeguard that life.

4. We entrust correctional officials with extraordinary power because incarceration is an essential function of a free and ordered society. Prisons exist to carry out lawful sentences and to protect the public, not to expose incarcerated individuals to unchecked violence. Society's trust in the correctional system depends on the expectation that those in custody will be

COMPLAINT

protected from known dangers, particularly violence at the hands of other inmates. That trust is broken when prison officials abandon vigilance, ignore warning signs, and tolerate conditions that predictably lead to death.

5. What society cannot tolerate from those charged with operating its prisons is apathy, indifference, or willful blindness. These are not unfortunate oversights; they are constitutional violations. When prison officials disregard obvious and repeated warnings of danger, they erode the legitimacy of the justice system itself and betray the fundamental principles that justify incarceration in the first place.

6. It is in this context that this pleading turns to the death of William J. Couste, and asks how a man serving his sentence at High Desert State Prison ended up fatally stabbed during a routine recreation period. It is easy to dismiss such deaths as inevitable or to look away from violence behind prison walls. But courts exist precisely because constitutional obligations do not disappear where public attention fades. There must always be a neutral forum to ask whether the State honored—or abandoned—its responsibilities.

7. In William Couste's case, several facts are critical. First, William Couste was not a violent offender within the prison system. He had no documented history of assaultive behavior, no gang affiliation, and no record of weapons violations while incarcerated. Second, he was confined at a facility where prison officials knowingly permitted an inmate with an extreme and well-documented history of in-prison violence—including a prior homicide and recent weapon possession—to access a Level IV general population yard. This was not an unforeseeable tragedy; it was the predictable result of deliberate decisions made in the face of obvious danger.

8. Perhaps the most important fact about William Couste's death is that it was not an isolated incident. From 2020 through 2025, at least eighteen incarcerated individuals were killed at High Desert State Prison in suspected inmate-on-

COMPLAINT

inmate homicides. Many of these deaths involved inmate-manufactured or improvised weapons, demonstrating repeated failures in weapon control, supervision, staffing, and classification. These homicides were investigated, documented, and reported, placing prison leadership on unmistakable notice that violence at HDSP was endemic and escalating.

9. The conditions that led to William Couste's death existed long before April 26, 2025. Despite differences in individual circumstances, a single, unifying factor animates these deaths: a sustained pattern of neglect and disregard for inmate safety. Long before William Couste was killed, Defendants knew that High Desert State Prison suffered from chronic understaffing, ineffective searches, blind spots in supervision, and a persistent flow of inmate-manufactured weapons—conditions that made lethal violence not only possible, but foreseeable.

10. Defendants were repeatedly put on notice of these dangers through internal investigations, incident reports, staffing audits, classification records, and a well-documented history of prior homicides. A 2015 Office of the Inspector General report detailed severe violence and failures to intervene at High Desert State Prison, including findings that even yards intended to protect vulnerable inmates were plagued by gang violence, extortion, and assaults occurring in the presence—or absence—of correctional staff. These warnings were neither isolated nor ambiguous.

11. Despite this extensive history and repeated notice, Defendants deliberately failed to take reasonable measures to protect inmates in their custody. They failed to adequately classify and segregate known violent offenders, failed to implement effective weapon-control measures, failed to maintain sufficient staffing and supervision, and failed to correct conditions that had already resulted in multiple deaths. By the time William Couste was released onto the Level IV yard on April 26, 2025, High Desert State Prison was permeated with

known, ongoing, and unabated risks of serious injury or death—risks that ultimately claimed William Couste's life.

## II.    JURISDICTION AND VENUE

12. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims as to form part of the same case or controversy.

14. Venue is proper pursuant to 28 U.S.C. §1391(b)(1) and (2) because the Defendants reside within the district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

## III.    GOVERNMENT CLAIM

15. On or about October 14, 2025, Plaintiff timely served a Notice of Claim on the State of California pursuant to Gov. Code § 911.2 et seq. The State of California did not respond and the claim is deemed denied by operation of law

16. Plaintiff has complied with the California Tort Claims Act requirements with respect to her claims arising under state law.

17. With respect to the supplemental state claims, Plaintiff requests that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over such claims as they arise from the same facts and circumstances which underlie the federal claims.

## IV.    PARTIES

18. Decedent William J. Couste was fifty-four (54) years old at the time of his death and the adult son of Plaintiff Susan Charney. At all relevant times, William Couste was incarcerated at High Desert State Prison ("HDSP") in Susanville, California.

19. Plaintiff SUSAN CHARNEY is, and at all relevant times was, the natural mother of William Couste and a resident of Los Angeles County, California. Plaintiff brings this action in her individual capacity as a statutory heir pursuant to California Code of Civil Procedure section 377.60, 42 U.S.C. sections 1983 and 1988, the United States Constitution, and applicable federal and California law.

20. Defendant STATE OF CALIFORNIA ("STATE") owns, operates, and exercises authority over Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR"), a state agency responsible for the administration and operation of California's state prisons, including High Desert State Prison. At all relevant times, the STATE, acting through CDCR and California Correctional Health Care Services ("CCHCS"), was responsible for ensuring that the policies, practices, customs, acts, and omissions of its employees complied with constitutional and statutory requirements and for safeguarding the health and safety of individuals incarcerated at HDSP.

21. Defendant ROBERT ST. ANDRE was, at all relevant times, the Warden of High Desert State Prison. In that role, Defendant St. Andre exercised authority over the operation and security of the facility, including inmate housing decisions, classification practices, staffing levels, security procedures, and measures intended to prevent violence. Defendant St. Andre is sued in his individual capacity for monetary damages.

22. Defendants DOES 1 through 50 are, and at all relevant times were, employees, agents, or contractors of CDCR assigned to High Desert State Prison, acting within the course and scope of their employment and under color of state law. Plaintiff is presently unaware of the true names and capacities of these

-6-
COMPLAINT

Defendants and will seek leave to amend this Complaint when their identities become known.

23. Defendant DOE 1 was the Chief Deputy Warden at High Desert State Prison and was responsible for oversight of custody operations, review and approval of inmate classification decisions, supervision of custody staff, and implementation of institutional security measures intended to protect incarcerated individuals from violence.

24. Defendants DOES 2 through 10 were members of the Institutional Classification Committee at High Desert State Prison who participated in, approved, or failed to alter the classification and housing placement of Rodger A. Brown, despite documented information reflecting Brown's history of in-prison murder and weapon possession.

25. Defendants DOES 11 through 25 were custody supervisors, including correctional sergeants and lieutenants, responsible for oversight of the Level IV yard where William Couste was attacked. Their duties included ensuring adequate staffing, enforcing security protocols, supervising searches for contraband and weapons, and responding to known safety risks.

26. Defendants DOES 26 through 50 were correctional officers assigned to supervise the Level IV yard on April 26, 2025. These Defendants were responsible for the direct custody and supervision of incarcerated individuals on the yard, including William Couste, and for conducting security searches, monitoring inmate activity, preventing the possession of weapons, and intervening to stop acts of violence.

27. Defendants DOES 1 through 50 are sued in their individual capacities for monetary damages.

28. At all relevant times, each individual Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983.

29. As used in this Complaint, the term "Individual Defendants" refers to Defendant Robert St. Andre and Defendants DOES 1 through 50, each of whom is sued in an individual capacity. Defendant CDCR is a state agency and is not an individual defendant. Plaintiff's civil rights claims under 42 U.S.C. section 1983 are asserted against the Individual Defendants only. Plaintiff's remaining causes of action are asserted against all Defendants, including STATE and CDCR, as permitted by law.

## V.    GENERAL ALLEGATIONS

### A. William Couste's Incarceration at HDSP

30. William J. Couste ("Mr. Couste" or "Decedent") was born on August 9, 1970. He was 54 years old at the time of his death.

31. Mr. Couste entered the custody of the California Department of Corrections and Rehabilitation ("CDCR") on or about November 21, 2024, following his transfer from Riverside County. He was serving a sentence of twenty-one (21) years and eight (8) months for transportation or importation of a controlled substance and evading a peace officer while driving recklessly.

32. At the time he was killed, Mr. Couste had served approximately five months of his sentence.

33. During his incarceration, Mr. Couste had no known gang affiliation, no validated Security Threat Group ("STG") designation, and no documented history of violent conduct.

34. Mr. Couste likewise had no disciplinary history involving violence, weapons, or assaultive behavior during his time at High Desert State Prison.

35. Mr. Couste was classified and housed on the Level IV yard at the time of his death.

COMPLAINT

**B. Rodger Brown's Violent History Known to Defendants**

36. At all relevant times, Rodger A. Brown ("Brown") was incarcerated at High Desert State Prison and had an extensive, well-documented history of violent behavior reflected in his institutional records.

37. Brown was initially received into CDCR custody on or about April 24, 2012, following his commitment from Siskiyou County. He was sentenced to fifteen (15) years for corporal injury on a spouse, with enhancements for inflicting great bodily injury in a domestic violence context and for a prior felony conviction.

38. Brown also received a separate three-year sentence for attempting to dissuade a victim or witness and for making criminal threats involving great bodily injury or death.

39. While incarcerated, Brown committed multiple additional violent felonies. Each of these offenses was recorded in CDCR's Strategic Offender Management System ("SOMS") and in Brown's Central File ("C-File"), both of which are routinely reviewed by classification staff, custody supervisors, and prison administrators. These convictions included:

   a. October 31, 2013: A conviction in Imperial County Superior Court for battery on a non-incarcerated person, arising from conduct committed while Brown was housed at Calipatria State Prison.

   b. January 24, 2024: A conviction in Lassen County Superior Court for second-degree murder as a third striker, stemming from an in-prison homicide committed at High Desert State Prison.

   c. October 10, 2024: A conviction in Lassen County Superior Court for possession or manufacture of a deadly weapon by a prisoner, based on conduct at High Desert State Prison, occurring approximately six months before William Couste was killed.

-9-
COMPLAINT

40. Brown's institutional records further contained chronos, incident reports, and classification materials documenting a persistent pattern of violent conduct, weapon possession, and assaultive behavior. These materials were available to, and routinely reviewed by, Institutional Classification Committee members, custody supervisors, and administrative staff.

## C. Classification Decisions Made in the Face of Known Danger

41. Following Brown's January 2024 murder conviction, Brown was subject to classification reviews to reassess his custody level, housing placement, and yard assignment.

42. Brown again became subject to classification review after his October 2024 conviction for weapon possession.

43. After these convictions, Brown appeared before the Institutional Classification Committee ("ICC") on multiple occasions. During these hearings, Defendants DOES 2 through 10 reviewed information establishing, among other things:

   a. Brown's January 2024 conviction for second-degree murder committed while incarcerated at HDSP;

   b. Brown's October 2024 conviction for possession or manufacture of a deadly weapon while incarcerated at HDSP;

   c. Brown's 2013 conviction for battery on a non-prisoner while incarcerated;

   d. Brown's elevated custody classification score based on these in-prison violent felonies;

   e. Brown's designation as a high-risk, violent inmate requiring heightened supervision;

   f. Incident reports and investigative summaries documenting Brown's acquisition and possession of an improvised weapon at HDSP in 2024.

44. Notwithstanding this information, Defendants DOES 2 through 10 elected to keep Brown on a Level IV general population yard. They did not recommend

administrative segregation, impose keep-separate restrictions, or implement separation measures to protect other inmates from Brown.

45. These classification determinations were documented in ICC minutes and CDC Form 128-G chronos maintained in Brown's C-File and made accessible to custody personnel and prison administrators.

46. Defendant DOE 1, as Chief Deputy Warden, reviewed or had access to these classification materials and nevertheless approved—or failed to alter—the decision to allow Brown continued access to the general population, including William Couste.

**D. Security and Staffing Deficiencies Known to Defendants**

*1. CDCR Staffing Requirements*

47. CDCR regulations and Department Operations Manual provisions establish minimum staffing requirements for Level IV yards to ensure adequate supervision and institutional security.

48. These requirements are intended to provide continuous visual coverage, reduce blind spots, allow for immediate response to violence, and prevent inmates from possessing or using weapons.

*2. Chronic Understaffing at HDSP*

49. At all relevant times, the Level IV yard at HDSP operated below required staffing levels.

50. As a result, officers were tasked with supervising approximately 200 to 300 inmates during recreation periods without sufficient personnel to do so safely.

51. This understaffing left portions of the yard outside of direct officer observation.

52. Defendant St. Andre was aware of these staffing deficiencies through reports and post audits reflecting routine failures to meet required officer-to-inmate ratios.

53. Defendant DOE 1 Chief Deputy Warden likewise knew of these conditions based on daily staffing rosters and audit materials.

54. Defendants DOES 11 through 25 were also aware of the understaffing through their direct responsibility for supervising yard operations and ensuring adequate coverage.

### 3. Conditions on April 26, 2025

55. On April 26, 2025, the Level IV yard remained understaffed. This resulted in inadequate visual supervision and created blind spots where the fatal attack occurred. Despite awareness of these conditions, Defendant St. Andre did not increase staffing, modify yard schedules, or limit yard access to match available supervision.

### 4. Weapon Control Failures

56. HDSP post orders and CDCR policy require pat-down searches and metal detector screening before inmates are released to recreation yards.

57. These search requirements are particularly critical for inmates with recent convictions for weapon possession, as they present a known and substantial risk of obtaining or manufacturing another weapon.

58. Despite Brown's October 2024 weapon possession conviction, Defendant St. Andre did not require enhanced searches, impose additional weapon-control measures, or direct that Brown be subjected to heightened screening.

59. Custody supervisors, including Defendants DOES 11 through 25, likewise failed to require or enforce more rigorous search procedures for Brown.

60. Weapon detection procedures at HDSP were inconsistently applied and ineffective. Metal detectors were either not used, or not calibrated to detect smaller improvised weapons, and pat-down searches were irregular and incomplete.

61. Tool control practices were also deficient, allowing inmates access to materials capable of being fashioned into stabbing weapons.

**E. Systemic Violence and Notice at High Desert State Prison**

62. High Desert State Prison is a high-security CDCR facility in Susanville, California, housing approximately 2,000 incarcerated individuals.

63. In 2015, the California Office of the Inspector General issued a special report documenting severe abuse, violence, and institutional failures at HDSP. The report found that so-called "sensitive needs yards"—designed to protect vulnerable inmates—were just as violent as general population yards, plagued by gang coercion, extortion, and retaliation. The report further documented instances in which incarcerated individuals were beaten or stabbed while correctional staff stood by without intervening.

64. These findings placed CDCR and HDSP leadership on notice that violence at the prison was pervasive, predictable, and inadequately controlled.

65. Between 2020 and April 2025, at least eighteen (18) incarcerated individuals were killed at High Desert State Prison in suspected inmate-on-inmate homicides, according to CDCR press releases. These deaths included, among others:

- **January 28, 2020** – *Richard Prieto* – Officers "recovered two inmate-manufactured weapons at the scene" of the attack

- **May 4, 2020** – *Michael M. Ramadanovic* – Attack "with inmate-manufactured weapons"

- **August 26, 2020** – *Juan M. Boyzo* – Officers recovered "two inmate-made weapons at the scene"

- **February 2, 2021** – *Christian Lepe* – Officers recovered "two inmate-manufactured weapons at the scene of the attack"

- **March 26, 2021** – *William R. Dye* – Attack "with an inmate-manufactured weapon"
- **January 8, 2022** – *Benjy S. Wade*
- **July 22, 2022** – *Albert Martinez*
- **October 14, 2022** – *Terence Coleman*
- **February 18, 2022** – *Michael Hastey* – Attack "with manufactured weapons"
- **August 26, 2023** – *Alexander J. Jasso* – "An inmate-manufactured weapon was recovered at the scene"
- **May 20, 2023** – *Jeffrey Concepcion*
- **May 6, 2024** – *Scott Cook* – "Two inmate-manufactured weapons were recovered at the scene"
- **June 27, 2024** – *Hector Hernandez*
- **August 22, 2024** – *Anthony Alverez* – Officers recovered "two inmate-manufactured weapons"
- **November 26, 2024** – *Juan Linares* – An "improvised weapon" used
- **April 26, 2025** – *William J. Couste* – An "improvised weapon" used

66. Each of these deaths was investigated by CDCR and formally reported to prison administration.

67. More than half of the suspected inmate-on-inmate homicides at HDSP between 2020 and 2025 involved inmate-manufactured or improvised weapons, including sharpened metal, altered tools, and other contraband capable of inflicting fatal injuries.

68. Despite this repeated and well-documented pattern:

- Inmates continued to access materials capable of being weaponized;
- Searches failed to detect improvised weapons;

-14-
COMPLAINT

- Staffing levels remained inadequate to deter or interrupt attacks;
- Attacks repeatedly occurred in areas not under direct officer supervision.

69. This pattern made clear that weapon control at HDSP was systemically ineffective, and that further homicides were not merely possible, but foreseeable.

**F. The Attack on April 26, 2025**

70. During a scheduled morning recreation period on April 26, 2025, William Couste was attacked by Rodger Brown with an improvised weapon on a Level IV yard. The assault occurred in an area not under continuous observation.

71. Custody staff did not intervene in time and failed to immediately summon or provide emergency medical care. Mr. Couste was pronounced deceased shortly thereafter.

72. Brown was either not searched prior to release to the yard or was searched in a manner that failed to detect the weapon he used.

73. Defendants DOES 26 through 50 failed to timely intervene or provide emergency medical assistance.

**G. Defendants' Knowledge and Conscious Disregard**

*1. Knowledge and Deliberate Indifference by ICC Members (DOES 2 through 10)*

74. Defendants DOES 2 through 10 served on the Institutional Classification Committee ("ICC") and reviewed Brown's CDCR institutional materials, including his Central File ("C-File") and Strategic Offender Management System ("SOMS") records, during classification proceedings. Those records reflected, among other things, Brown's January 2024 conviction for second-degree murder committed while incarcerated at HDSP and his October 2024 conviction for possession or manufacture of a deadly weapon by a prisoner, also arising from conduct at HDSP.

75. This information established that Brown had recently committed lethal violence while incarcerated and had recently possessed or manufactured a weapon in custody—facts that made the risk he posed to other inmates obvious, substantial, and ongoing if he remained housed in a general population setting with access to other inmates and opportunities to obtain or make weapons.

76. Even with that knowledge, DOES 2 through 10 approved, continued, or failed to change Brown's placement on a Level IV general population yard. They did not recommend administrative segregation or comparable restrictive housing, did not impose "keep separate" restrictions, and did not implement enemy separation procedures. Their decisions left Brown in close proximity to other inmates, including William Couste, despite the known danger.

*2. Knowledge and Deliberate Indifference by Chief Deputy Warden (DOE 1)*

77. As Chief Deputy Warden responsible for custody operations and oversight of classification decisions, Defendant DOE 1 reviewed or had access to ICC minutes, classification chronos, and custody documentation reflecting Brown's in-prison murder conviction and recent weapon conviction at HDSP.

78. Defendant DOE 1 also knew that the Level IV yard was routinely operated below CDCR-required staffing levels, as shown by daily staffing rosters and post audit documentation reflecting repeated failures to meet minimum staffing ratios.

79. Despite these known risks—housing a demonstrably violent inmate with recent weapon possession in a setting with inadequate supervision—Defendant DOE 1 approved, ratified, or failed to correct Brown's continued general population placement, failed to ensure sufficient staffing on the Level IV yard, and failed to require effective weapon-control measures or heightened screening for inmates with recent weapon convictions.

*3. Knowledge and Deliberate Indifference by Defendant Warden St. Andre*

80. Defendant Robert St. Andre, as Warden, received or had access to information showing a substantial risk of serious harm at HDSP, including reports and summaries regarding Brown's January 2024 murder conviction and October 2024 weapon conviction, documentation of multiple prior inmate homicides at HDSP, staffing reports and post audits reflecting chronic understaffing, and after-action materials identifying repeated breakdowns in weapon control and supervision.

81. Collectively, this information reflected systemic failures in classification, staffing, supervision, and contraband control—conditions that enabled inmates to obtain weapons and carry out fatal assaults. The pattern of homicides in the years and months preceding April 26, 2025, underscored that without meaningful intervention, additional lethal attacks were foreseeable and likely.

82. Nevertheless, Defendant St. Andre failed to take reasonable corrective measures. He did not secure additional staffing resources to meet minimum ratios, did not modify yard operations to align with available supervision, and did not limit yard access to prevent predictable blind spots. After Brown's October 2024 weapon conviction, St. Andre also failed to implement heightened search procedures for Brown, failed to direct stronger weapon-control practices on the Level IV yard, and failed to require more frequent or thorough screening of inmates with recent weapon possession histories. These omissions, despite known risk, constitute deliberate indifference to inmate safety.

*4. Knowledge and Deliberate Indifference by Custody Supervisors (DOES 11 through 25)*

83. Defendants DOES 11 through 25, as custody supervisors (including sergeants and lieutenants) responsible for Level IV yard operations, were informed of

Brown's violent history and risk status through custody briefings, post orders, incident documentation, and classification materials. They also observed, first-hand, the chronic understaffing on the yard and the operational consequences of insufficient coverage.

84. Even so, DOES 11 through 25 did not implement adequate safeguards. They failed to ensure adequate officer staffing on April 26, 2025, failed to adjust supervision and positioning to eliminate blind spots, failed to limit the number of inmates released to the yard to match available coverage, and failed to require enhanced searches or heightened screening for Brown or similarly situated inmates with recent weapon convictions.

5. *Knowledge and Deliberate Indifference by Correctional Officers (DOES 26 through 50)*

85. Defendants DOES 26 through 50 were the correctional officers assigned to supervise the Level IV yard on April 26, 2025. Through daily briefings and post orders, they knew Brown was a high-risk inmate with a recent weapon-related conviction.

86. CDCR policy and HDSP post orders require officers to conduct pat-down searches and metal detector screening before inmates are released to the recreation yard, particularly for inmates with recent weapon possession convictions who present an elevated risk of bringing contraband onto the yard.

87. Despite these requirements and the known risk, DOES 26 through 50 failed to conduct adequate screening before releasing Brown to the yard, permitting him to enter the recreation area with an improvised weapon that he used to kill William Couste.

88. In addition, DOES 26 through 50 failed to maintain continuous visual supervision of the yard, allowing the assault to occur in an area not under direct observation. They did not intervene promptly once the attack began and did not

immediately summon or provide emergency medical assistance after William Couste was attacked.

**H. Causation**

89. Each Defendant's deliberate indifference to Mr. Couste's safety was a substantial factor in causing his death.

90. Had DOES 2 through 10 classified Brown appropriately and required his placement in administrative segregation or comparable restrictive housing in light of his in-prison murder conviction and weapon conviction, Brown would not have had access to William Couste on a Level IV general population yard.

91. Had Defendant DOE 1 ensured adequate staffing and enforced heightened search and weapon-control protocols for inmates with recent weapon possession histories, Brown would not have been able to enter the yard with an improvised weapon.

92. Had Defendant St. Andre acted on the known pattern of homicides and documented security failures by providing sufficient staffing, strengthening contraband control, and mandating enhanced searches for inmates with recent weapon convictions, Brown would not have been able to obtain and use a weapon to fatally attack William Couste.

93. Had DOES 11 through 25 ensured adequate staffing on April 26, 2025, adjusted officer placement to eliminate blind spots, and required mandatory enhanced screening for Brown, the weapon would have been detected or officers would have been positioned to stop the attack before it became fatal.

94. Had DOES 26 through 50 conducted the required pat-down and metal detector screening before releasing Brown to the yard, the weapon would have been discovered and confiscated.

95. Had DOES 26 through 50 maintained continuous yard supervision and responded promptly, they would have observed the assault and intervened before William Couste was killed.

## I. Damages

96. As a direct and proximate result of Defendants' wrongful conduct, Susan Charney has suffered and continues to suffer damages.

97. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages including, but not limited to: the wrongful death of William Couste; loss of William's love, companionship, comfort, care, assistance, protection, affection, society, and moral support; severe emotional distress, grief, and mental anguish; loss of financial support and contributions that Mr. Couste would have provided; funeral and burial expenses; and other damages to be proven at trial.

## VI.    FIRST CAUSE OF ACTION

### FAILURE TO PROTECT FROM HARM, VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

### (By Plaintiff Against Defendants Robert St. Andre and DOES 1 through 50)

98. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

99. Defendants Robert St. Andre and DOES 1 through 50, and each of them, were deliberately indifferent to the health and safety of William J. Couste. Defendants knew that Rodger A. Brown had a documented history of extreme violence while incarcerated, including a prior in-prison homicide at High Desert State Prison and a recent conviction for possession or manufacture of a deadly weapon while incarcerated. Defendants further knew that Brown posed a substantial and ongoing risk of serious harm to other incarcerated individuals if permitted to remain in the general population.

-20-
COMPLAINT

100.   Despite having actual knowledge of the increased risk of harm to William Couste arising from Brown's violent propensities and demonstrated ability to obtain or manufacture weapons while incarcerated, Defendants were deliberately indifferent to William Couste's safety by choosing to house Brown on a Level IV general population yard and by failing to separate him from other inmates, including William Couste, who had no history of violence and posed no known threat to others.

101.   Notably, Defendants failed to implement adequate security measures to protect William Couste, including but not limited to failing to conduct proper searches of Brown before releasing him to the recreation yard, failing to prevent Brown from possessing an improvised weapon, failing to maintain adequate staffing and continuous visual supervision of the yard, and failing to position custody staff so as to eliminate known blind spots. As a result of these failures, Brown was able to attack William Couste with an improvised stabbing weapon in an area not under direct officer observation.

102.   Defendants further failed to promptly intervene to stop the attack and failed to immediately summon or provide emergency medical assistance once William Couste was assaulted. Defendants' failure to adequately supervise, protect, and respond to the known risk of inmate-on-inmate violence directly and proximately caused the fatal injuries suffered by William Couste.

103.   The conduct of Defendants, and each of them, constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and was willful, wanton, malicious, and undertaken with deliberate indifference to the constitutional rights and safety of William J. Couste, thereby warranting an award of exemplary and punitive damages against the individual Defendants.

## VII.   SECOND CAUSE OF ACTION

### WRONGFUL DEATH (CALIFORNIA CODE OF CIVIL PROCEDURE §377.60)

### (By Plaintiff As Against All Defendants)

104.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

105.   California Code of Civil Procedure section 377.60 provides that a cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the decedent's heirs.

106.   Susan Charney is William Couste's biological mother and heir and brings this wrongful death action in her individual capacity.

107.   Mr. Couste's death on April 26, 2025, was caused by the wrongful acts, omissions, and deliberate indifference of Defendants as alleged herein.

108.   Defendants owed a duty of care to Mr. Couste to provide him with a reasonably safe environment, to protect him from foreseeable harm, to properly classify and supervise dangerous inmates, to implement adequate security measures, and to take reasonable steps to prevent violent attacks by inmates with known violent propensities.

109.   Defendants breached their duty of care through the failures alleged in detail above, including failures in classification, housing, supervision, searches, weapon control, and security protocols.

110.   Defendants' breaches of their duty of care were a substantial factor in causing Mr. Couste's death.

111.   As a direct and proximate result of Defendants' wrongful conduct, Susan Charney has suffered and continues to suffer damages as alleged above.

## VIII. THIRD CAUSE OF ACTION

### PUBLIC ENTITY LIABILITY FOR FAILURE TO PERFORM MANDATORY DUTY

### (By Plaintiff Against All Defendants)

112. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

113. At all relevant times, Defendants owed mandatory duties to William Couste imposed by state law, state regulations, and departmental policies, including:

a. California Penal Code Section 2650 provides: "The person of a prisoner sentenced to imprisonment in the State prison is under the protection of the law, and any injury to his person, not authorized by law, is punishable in the same manner as if he were not convicted or sentenced." This statute establishes the state's mandatory duty to protect prisoners from unauthorized injury.

b. California Penal Code Section 2652 provides that "It shall be unlawful to use in the prisons, any cruel, corporal or unusual punishment or to inflict any treatment or allow any lack of care whatever which would injure or impair the health of the prisoner, inmate or person confined." This statute imposes a mandatory duty not to allow any lack of care that would injure or impair the health of prisoners.

c. California Code of Regulations, Title 15, Section 3375(c) provides that "Each determination affecting an incarcerated person's placement within an institution or facility, transfer between facilities, program participation, privilege groups, or custody designation shall be made by a classification committee composed of staff knowledgeable in the classification process." This regulation mandates that classification decisions affecting inmate placement and custody designation be made by qualified staff through a proper classification process.

d. California Code of Regulations, Title 15, Section 3375(g)(5)(D) requires classification committees to document and consider an inmate's "Commitment offense(s)" during classification reviews. This regulation mandates consideration of an inmate's criminal history, including violent offenses, in classification decisions.

e. California Code of Regulations, Title 15, Section 3375.3(b)(4) establishes a classification scoring system that assigns points for violent institutional behavior, including battery on non-incarcerated persons and battery on incarcerated persons. This regulation mandates that violent institutional conduct be considered and weighted in determining an inmate's custody level and housing placement.

f. California Code of Regulations, Title 15, Section 3377.2 establishes "Criteria for Assignment of Close Custody" and identifies specific case factors, including security concerns and violent behavior, that mandate assignment to higher custody levels. This regulation requires that inmates presenting security concerns due to violent conduct be classified to appropriate restrictive custody levels.

g. California Code of Regulations, Title 15, Section 3287 governs "Cell, Property, and Body Inspections" and mandates that staff conduct searches of inmates and their property to maintain institutional security and prevent possession of contraband, including weapons.

114. These duties are mandatory, not discretionary. The statutes use prohibitory language ("It shall be unlawful"), the regulations use mandatory language ("shall be made," "shall be entered"), and the duties are ministerial acts – identifying violent criminal history, calculating classification scores, and conducting security searches – that do not involve substantial policy discretion.

COMPLAINT

115. Defendants violated these mandatory duties through the acts and omissions alleged in detail above, including but not limited to: failing to properly classify and house Brown despite his documented history of in-prison murder and weapon possession; failing to conduct adequate searches of Brown before releasing him to the yard on April 26, 2025; failing to maintain adequate staffing levels on the Level 4 yard; failing to maintain adequate supervision; and failing to implement effective security measures to protect William from foreseeable violence.

116. Defendants' violations of these mandatory duties were a substantial factor in causing William Couste's death.

117. As a direct and proximate result of Defendants' violations of mandatory duties, Plaintiff has suffered damages including, but not limited to: the wrongful death of William Couste; loss of William's love, companionship, comfort, care, assistance, protection, affection, society, and moral support; severe emotional distress, grief, and mental anguish; loss of financial support and contributions that Mr. Couste would have provided; funeral and burial expenses; and other damages to be proven at trial.

## IX.  FOURTH CAUSE OF ACTION

### NEGLIGENCE

### (By Plaintiff Against All Defendants)

118. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

119. At all relevant times, Defendants owed a duty of care to William Couste to exercise reasonable care in operating High Desert State Prison, including duties to provide adequate security, maintain adequate staffing, properly classify inmates, prevent inmates from obtaining weapons, and protect inmates from foreseeable violence by other inmates.

120. Defendants breached their duty of care through the negligent acts and omissions alleged in detail above, including but not limited to: (a) negligently maintaining chronically inadequate staffing levels on the Level 4 yard in violation of CDCR requirements; (b) negligently classifying and housing Rodger Brown on general population housing despite his documented history of in-prison murder and recent weapon possession; (c) negligently failing to conduct adequate searches of Brown before releasing him to the yard on April 26, 2025, despite his recent weapon possession conviction; (d) negligently failing to maintain adequate visual supervision of the Level 4 yard, resulting in blind spots where the attack occurred; (e) negligently failing to implement and enforce adequate weapon control protocols to prevent Brown from obtaining the improvised weapon used to kill William; (f) negligently failing to take corrective action to address the pattern of multiple homicides at HDSP between 2022 and November 2024; and (g) negligently failing to request additional staffing resources, adjust yard schedules, or implement enhanced security measures despite knowledge of chronic understaffing and multiple recent homicides.

121. Defendants' negligence was a substantial factor in causing William Couste's death.

122. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered damages as alleged above.

## X.   FIFTH CAUSE OF ACTION

### VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6

### (By Plaintiff Against All Defendants)

123. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

124. California Government Code section 845.6 provides that a public entity is liable for injury proximately caused by the failure of a peace officer or custodial officer to summon medical care for a person in their custody who reasonably appears to be in need of immediate medical care, and for injury proximately caused by the failure of a public employee to furnish medical care to a prisoner in their custody.

125. At all relevant times, William Couste was a prisoner in the custody of Defendants.

126. Defendants failed to provide adequate care and protection to William while he was in their custody by failing to protect him from the foreseeable and preventable attack by Rodger Brown through the acts and omissions alleged in detail above.

127. Defendants knew or should have known of Brown's dangerous propensities and the substantial risk he posed to other inmates, including William, based on Brown's documented history of in-prison murder and weapon possession.

128. Defendants' failures to properly classify Brown, adequately staff the Level 4 yard, conduct adequate searches, maintain adequate supervision, and implement effective weapon control measures proximately caused William's death.

129. As a direct and proximate result of Defendants' violations of Government Code section 845.6, Plaintiff has suffered damages as alleged above.

## XI.   SIXTH CAUSE OF ACTION

**NEGLIGENCE (CAL. CIV. CODE § 1714(A); CAL. GOV. CODE §§ 845.2, 820, 844.6, 845.6)**

**(By Plaintiff Against All Defendants)**

130. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

131. At all times relevant herein, Defendants, and each of them, owed a duty to Plaintiff to act with the ordinary care of reasonable persons. "Every person is

bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights." CA Civ. Code § 1708.

132. There is a special relationship between a jailer and inmate. Imposing on the former a duty of care to the latter. Inmates, like William Couste, are vulnerable. And dependent. The relationship between them is protective by nature, such that the jailer has control over the inmate, who is deprived of the normal opportunity to protect himself from the harm inflicted by others.

133. At all times, Defendants, and each of them, owed Plaintiff and decedent William Couste the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

134. At all times, these Defendants owed Plaintiff and decedent William Couste the duty to act with reasonable care.

## A. Individual Liability

135. Defendants Does 1 through 50, while acting within the course and scope of their employment with CDCR, owed William Couste a duty of ordinary and reasonable care to ensure his safety, protection, and provision of medical attention while in state custody. This duty arose from the special relationship between custodial officers and inmates, under which officers must take reasonable steps to protect prisoners from foreseeable harm.

136. Defendants Does 1 through 50 breached that duty of care by, among other negligent acts and omissions: (a) improperly classifying and housing William Couste in proximity to violent inmates, including Rodger Brown; (b) failing to properly classify Rodger Brown and separate him from general population inmates despite his documented history of in-prison murder and weapon possession; (c) failing to maintain adequate supervision and security checks in the housing unit and recreation yard where the attack occurred; (d) allowing the circulation and possession of inmate-manufactured weapons by failing to

conduct adequate searches and inspections; (e) failing to maintain adequate staffing levels on the Level 4 yard on April 26, 2025, in violation of CDCR staffing requirements; (f) failing to provide adequate visual supervision of the area where the attack occurred, creating blind spots that allowed the attack to proceed undetected; (g) failing to intervene promptly once the attack began despite audible and visible signs of violence; (h) failing to promptly summon or provide emergency medical assistance once William Couste was attacked and visibly in distress; and (i) failing to implement or enforce adequate security protocols, weapon control measures, and violence prevention policies despite knowledge of chronic understaffing, prior violent incidents, and the presence of violent inmates with weapon possession histories.

137.   As a direct and proximate result of these negligent acts and omissions, William Couste suffered severe physical and emotional injuries and ultimately died. Plaintiff is entitled to recover compensatory damages from Defendants CDCR, Warden Robert St. Andre, and Does 1 through 50, and punitive damages from the individual Defendants whose conduct was malicious, oppressive, or in reckless disregard of Mr. Couste's safety.

## B.  Supervisory Negligence

138.   Defendant Warden Robert St. Andre, while acting within the course and scope of his employment, owed William Couste a duty to exercise reasonable care in the supervision, training, and management of correctional staff to ensure inmate safety and compliance with institutional security procedures. Warden St. Andre breached that duty by failing to implement and enforce adequate safety policies, training, and supervision, and by permitting a pattern of neglect and non-response to inmate violence.

COMPLAINT

## C. Vicarious Liability

139.   Pursuant to Government Code section 815.2(a), Defendant CDCR is vicariously liable for the negligent acts and omissions of their employees and agents, including Warden St. Andre and Does 1 through 50, committed within the course and scope of employment.

140.   As a direct and proximate result of Defendants' negligence, William Couste suffered pain, suffering, and emotional distress prior to his death. Plaintiff seeks compensatory damages from Defendants CDCR, Robert St. Andre, and Does 1 through 50, and punitive damages from the individual Defendants whose conduct was malicious, oppressive, or in reckless disregard of Mr. Couste's safety.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them, as follows:

A.   For general damages in an amount to be proven at trial;

B.   For special damages in an amount to be proven at trial;

C.   For punitive damages against the individual Defendants Robert St. Andre and Does 1 through 50 in an amount sufficient to punish and deter such conduct;

D.   For pre-judgment and post-judgment interest at the legal rate;

E.   For costs of suit incurred herein;

F.   For reasonable attorneys' fees as authorized by 42 U.S.C. §§ 1983 and 1988 and other applicable law; and

//
//
//
//
//

-30-

COMPLAINT

G.  For such other further relief as the Court deems just and proper.

Dated:  December 30, 2025                           MCCUNE LAW GROUP


                                    By:_____
                                          Joseph L. Richardson
                                          Brynna D. Popka
                                          Attorneys for Plaintiff

COMPLAINT

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a jury trial on all issues so triable.


Dated:  December 30, 2025                          MCCUNE LAW GROUP


By:_____
                          Joseph L. Richardson
                          Brynna D. Popka
                          Attorneys for Plaintiff

COMPLAINT